UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.: **00 - 6643**

**CIV - SEITZ**

SUNCHOICE MEDICAL SUPPLY, )
INC.. a foreign corporation, and )
successor to and assign of )
CONTOUR MEDICAL. INC.. )
)
          Plaintiff, )
)
vs. )
)
GARY COHEN and ROSEANN )
COHEN, individually, and STAR )
MEDICAL DISTRIBUTERS, LLC, )
a Florida Corporation, )
)
          Defendants. )
_____)

MAGISTRATE JUDGE
GARBER



## COMPLAINT

Plaintiff, SUNCHOICE MEDICAL SUPPLY, INC. ("SUNCHOICE"), as successor

to and assignee CONTOUR MEDICAL. INC. ("CONTOUR"), by and through its undersigned

counsel, files this Complaint against Defendants, GARY COHEN and ROSEANN COHEN (the

"COHENS'), and STAR MEDICAL DISTRIBUTERS, LLC ("STAR"), and alleges:

1.    This is an action to enforce a non-competition agreement and asserting. *inter*

*alia*, state law claims including breach of contract, equitable accounting, and tortious interference

with contractual relations.

1



## PARTIES AND JURISDICTION

2.      This Court has original jurisdiction pursuant to the diversity of citizenship provisions contained in 28 U.S.C. § 1332. Moreover, venue properly lies in this District Court pursuant to the provisions of 28 U.S.C. § 1391 (a).

3.      This is an action for injunctive relief and damages in excess of $75,000.00, exclusive of interest and costs.

4.      SUNCHOICE is, and at all times mentioned was, a New Mexico corporation with its primary place of business in New Mexico.

5.      SUNCHOICE is, and at all times mentioned was authorized to do business in Fort Lauderdale, Florida.

6.      Upon information and belief, the COHENS are residents of Broward County, Florida.

7.      Upon information and belief, the COHENS are owners and/or operators of, or are affiliated with, STAR, a Florida corporation which is conducting business in Fort Lauderdale, Broward County, Florida.

8.      Defendant STAR MEDICAL DISTRIBUTERS, LLC is a Florida corporation doing business in Fort Lauderdale, Broward County, Florida.

## FACTS

9.      On or about August 9, 1996, CONTOUR entered into a Stock Purchase Agreement ("Agreement") with the COHENS which provided, that CONTOUR would purchase all of the COHENS' shares of certain medical supply companies. A copy of the Agreement is attached at Tab A.

2

10.     Pursuant to the Agreement:

a.     the COHENS became employed with CONTOUR on or about August 9, 1996;

b.     the COHENS would be employed by CONTOUR. and that the period of two (2) years following the COHENS' termination of such employment or three (3) years following the closing date of August 9, 1996, whichever is the later. would be referred to as the "Noncompete Period" as described at paragraph 6.1 of the Agreement;

c.     the COHENS would engage in the promotion, sale. or distribution of medical supplies as described in the "Noncompetition" clause at paragraph 6.1 of the Agreement;

d.     the COHENS would not interfere with CONTOUR business and operations as described in the "No Interference" clause at paragraph 6.2 of the Agreement;

e.     the COHENS would not solicit CONTOUR customers as described in the "Nonsolicitation" clause at paragraph 6.3 of the Agreement; and

f.     all representations, warranties, covenants, and agreements are for the sole benefit of the parties hereto and their respective heirs. executors. legal representatives, successors and assigns as described at paragraph 7.5 of the Agreement.

11.     As of January 1. 2000. SUNCHOICE became the successor and assignee of CONTOUR and the Agreement. SUNCHOICE and CONTOUR will be hereinafter. disjunctively or conjunctively, referred to as "SUNCHOICE".

12.     SUNCHOICE has invested and will continue to invest considerable resources to develop information, methods, and techniques to promote, sell, and distribute medical supplies.

3

13.     SUNCHOICE entered into the "noncompetition." "no interference." and "Nonsolicitation" clauses of the Agreement with the Cohens to protect SUNCHOICE's business. group lists. information, methods, techniques, training, and goodwill during the Noncompete Period.

14.     It was the COHENS' duty, while employed by CONTOUR, to develop new clients: to maintain business relationships with existing clients; to develop and maintain lists of client candidates, clients and contacts; and to work diligently to develop business.

15.     As a result of the Agreement between the COHENS and CONTOUR, and in the course of the COHENS' employment, SUNCHOICE expended significant resources training and employing the COHENS to perform their duties.

16.     SUNCHOICE, conversely, has invested and will continue to invest considerable resources to identify entities that utilize medical supplies, to sell medical supplies to these entities, to earn profits from such sales, to maintain the business relationship with these entities. to learn clients' business needs, to develop innovative solutions to meet clients' business needs, and to develop and maintain potential client candidates.

17.     The COHENS terminated their employment with CONTOUR on or about October 8, 1999.

18.     Upon information and belief, the COHENS, through their business STAR, are now engaged in the business of promoting, selling, or distributing medical supplies in violation of their "Noncompete" Agreement covenant at paragraph 6.1 of the Agreement.

19.     Upon information and belief, the COHENS, through their business STAR, are now engaged in hiring or offering employment to SUNCHOICE employees in violation of their "No Interference" Agreement covenant at paragraph 6.2 of the Agreement.

4

20.     Upon information and belief, the COHENS, through their business STAR,
are now engaged in soliciting SUNCHOICE business in violation of their "Nonsolicitation"
Agreement covenant at paragraph 6.3 of the Agreement.

21.     The COHENS' violation of their "Noncompete," No Interference," and
"Nonsolicitation" covenants has and will continue to cost SUNCHOICE irreparable damage in
excess of $75,000, exclusive of interest and costs, which represents the value of the rights sought
to be protected by SUNCHOICE.

22.     Upon information and belief, the COHENS and STAR removed from
CONTOUR confidential information and trade secrets related to the business of SUNCHOICE.

23.     On September 24, 1999, SUNCHOICE wrote to the COHENS and advised
them, that they were prohibited from competing with SUNCHOICE during the Noncompetition
Period.

24.     On January 20, 2000, SUNCHOICE wrote to the COHENS and advised them
to cease and desist from competing or interfering with SUNCHOICE, or soliciting SUNCHOICE
employees. The COHENS have refused and failed to cease and desist their actions.

## COUNT ONE

### BREACH OF CONTRACT - AS AGAINST
### DEFENDANTS ROSEANN COHEN AND GARY COHEN

25.     SUNCHOICE incorporates and realleges paragraphs 1 through 24 of this
Complaint as though fully set forth herein.

26.     The COHENS' conduct as alleged herein constitutes a breach of the
provisions of their Agreement.

5

27.     Upon information and belief. the COHENS breached their Agreement in that they have competed with SUNCHOICE, interfered with SUNCHOICE operations, and solicited directly or indirectly, SUNCHOICE clients and prospects.

28.     As a result of the COHENS' breach of the Agreement, SUNCHOICE has been and/or will be severely and irreparably damaged.

29.     SUNCHOICE will not have an adequate remedy at law for the harm and damage which the COHENS' breach of their Agreement has and continues to cause.

30.     All conditions precedent necessary for the enforcement of the Agreement have been satisfied.

WHEREFORE, SUNCHOICE demands the following:

a.     An injunction prohibiting the COHENS from breaching the "Noncompetition." "No Interference." and "Nonsolicitation" covenants of the Agreement;

b.     That a receiver be appointed to collect from the COHENS all confidential, proprietary and other trade information in their custody, control or possession;

c.     An accounting for and payment of any compensation. commission. bonus. salary. gratuity. emolument. or other gain received. directly or indirectly, by the COHENS in any transaction or employment connected with the breach of the Agreement;

d.     That the COHENS be enjoined from duplicating or disposing of any confidential or proprietary information or any money received or generated by the COHENS following their termination of employment with SUNCHOICE;

e.     Costs, including reasonable attorneys' fees, incurred by SUNCHOICE in enforcing the Agreement; and

6

f.      Such other and further relief as this Court may deem proper.

## COUNT TWO

### BREACH OF DUTY OF LOYALTY- AS AGAINST
### DEFENDANTS ROSEANN COHEN AND GARY COHEN

31.     SUNCHOICE incorporates and realleges paragraphs 1 through 24 of this

Complaint as though fully set forth herein.

32.     The COHENS held positions of responsibility and trust with CONTOUR and,

therefore, owed a duty of loyalty to SUNCHOICE.

33.     SUNCHOICE entrusted the COHENS with confidential information and trade

secrets for the sole purpose of performing their duties with SUNCHOICE.

34.     By virtue of the aforesaid actions, the COHENS breached their duty not to

use, in competition with SUNCHOICE, SUNCHOICE's trade secrets and confidential information.

35.     The COHENS are guilty of misconduct toward SUNCHOICE and are

unfaithful to the trust placed on them by SUNCHOICE.

36.     As a result of the COHENS' breach of her duty of loyalty, SUNCHOICE has

been and/or will be severely and irreparably damaged.

WHEREFORE, SUNCHOICE demands the following:

a.      Compensatory damages;

b.      Costs; and

c.      Such other and further relief as this Court may deem proper.

7

## COUNT THREE

### TORTIOUS INTERFERENCE WITH
### BUSINESS RELATIONS - AS AGAINST ALL DEFENDANTS

37.     SUNCHOICE incorporates and realleges paragraphs 1 through 24 of this Complaint as though fully set forth herein.

38.     Through their employment at SUNCHOICE, the COHENS knew of SUNCHOICE's business relationships with its clients and prospects and had previously worked with these same clients and candidates while employees of SUNCHOICE.

39.     Upon information and belief, STAR and their principals and agents also knew of SUNCHOICE's business relationships with its clients and client candidates.

40.     Upon information and belief, the COHENS and STAR have intentionally, maliciously, and without justification acted to deprive SUNCHOICE of its existing business relationships by misappropriating and misusing confidential information.

41.     The COHENS' and STAR's interference was wrongful and tortious.

42.     As a result of the tortious actions by the COHENS and STAR, SUNCHOICE has been and will be damaged.

43.     SUNCHOICE will not have an adequate remedy at law for the harm and damage which the COHENS' and STAR's tortious interference with SUNCHOICE's business relations will cause.

WHEREFORE, SUNCHOICE demands the following:

a.     An injunction prohibiting the COHENS and STAR from using property or confidential information of SUNCHOICE to solicit or divert business from any client

8

or candidate existing at the time the COHENS resigned their employment with SUNCHOICE or who the COHENS contacted during the term of their Agreement with SUNCHOICE;

b.   An injunction prohibiting the COHENS and STAR from engaging in the promotion, sale, or distribution or medical supplies for the term of the Noncompete Period;

c.   That the COHENS and STAR be enjoined from duplicating or disposing of any confidential or proprietary information or any money received or generated by the COHENS as a result of their relationship with SUNCHOICE following their termination of employment with SUNCHOICE ;

d.   Compensatory damages;

e.   Costs; and

f.   Such other and further relief as this Court may deem proper.

## COUNT FOUR

## EQUITABLE ACCOUNTING AGAINST THE COHENS

44.   SUNCHOICE incorporates and realleges paragraphs 1 through 24 of this Complaint as though fully set forth herein.

45.   On or about August 9, 1996, the COHENS executed the Agreement with CONTOUR, the predecessor of SUNCHOICE.

46.   Upon information and belief, the COHENS breached the Agreement by, among other things:

a.   diverting and misappropriating proprietary and confidential information from SUNCHOICE during and/or after their employment with it; and

9

b. realizing profits and receiving money through their misuse of SUNCHOICE's confidential and proprietary information.

47. SUNCHOICE is uncertain of the extent of the COHENS' misappropriation of information or money received from the use of such information.

48. SUNCHOICE believes the COHENS have derived a substantial profit or other revenues through her misuse of SUNCHOICE's confidential and proprietary information.

WHEREFORE, SUNCHOICE demands the following:

a. That a receiver be appointed to collect from the COHENS all confidential, proprietary and other trade information in their custody, control or possession;

b. An accounting for and payment of any compensation, commission, bonus, salary, gratuity, emolument, or other gain received, directly or indirectly, by the COHENS in any transaction or employment connected with the breach of the Agreement;

c. That the COHENS be enjoined from duplicating or disposing of any confidential or proprietary information or any money received or generated by the COHENS following their termination of employment with SUNCHOICE;

d. Compensatory damages;

e. An order requiring the COHENS to return the compensation paid to them by STAR during their period of disloyalty; and

f. Such other and further relief as this Court may deem proper.

## PUNITIVE DAMAGES

49. Plaintiff reserves the right to amend the Complaint to add a demand for punitive damages.

10

DATED this __11TH__ day of May 2000.

Respectfully submitted,

JACKSON LEWIS SCHNITZLER & KRUPMAN
First Union Financial Center, Suite 2600
200 South Biscayne Boulevard
Miami, Florida 33131
Telephone 305-577-7600
Facsimile   305-373-4466

By:

Patrick G. DeBlasio, Esq.
Florida Bar No. 871737
*E-mail: DeBlasiP@jacksonlewis.com*

Michael M. Hernandez, Esq.
Florida Bar No. 2267
*E-mail: HernandM@jacksonlewis.com*

ATTORNEYS FOR PLAINTIFF

H:\SUN HEALTHCARE GROUP\Cohens Pleadings\Complaint 001.wpd

11

**SHARE PURCHASE AGREEMENT**

Relating to the Acquisition by

**CONTOUR MEDICAL, INC.**

of

All of the Outstanding Capital Stock of

**FACILITY SUPPLY, INC.**

**FLORIDA ACLF, INC.**

**and**

**GERIMED, INC.**

owned by

**GARY COHEN and ROSEANN COHEN**

As of July 1, 1996

## TABLE OF CONTENTS

Page

INTRODUCTION ............................................... 1

BACKGROUND ............................................... 1

TERMS AND CONDITIONS ...................................... 1

   SECTION 1. Definitions ...................................... 1

   SECTION 2. Sale and Purchase of the Shares ..................... 3

   SECTION 3. Closing ........................................ 3

   SECTION 4. Representations and Warranties of the Shareholders .......... 4

| | | |
|---|---|---|
| 4.1. | Share Ownership | 4 |
| 4.2. | Authority and Binding Effect | 4 |
| 4.3. | Validity of Contemplated Transactions | 4 |
| 4.4. | Restrictions | 4 |
| 4.5. | Full Disclosure | 4 |
| 4.5. | Purchase Entirely for Own Account | 4 |
| 4.7. | Reliance Upon Representations | 5 |
| 4.8. | Receipt of Information | 5 |
| 4.9. | Investment Experience | 5 |
| 4.10. | Accredited Investor | 5 |
| 4.11. | Restricted Securities | 6 |
| 4.12. | Legends | 6 |

   SECTION 5. Representations and Warranties of the Buyer and RCA ........ 6

| | | |
|---|---|---|
| 5.1. | Organization and Standing | 6 |
| 5.2. | Authority and Binding Effect | 6 |
| 5.3. | Validity of Contemplated Transactions | 7 |
| 5.4. | Restrictions | 7 |
| 5.5. | Reports | 7 |
| 5.6. | Full Disclosure | 7 |
| 5.7. | Purchase Entirely for Own Account | 8 |
| 5.8. | Reliance Upon Representations | 8 |
| 5.9. | Receipt of Information | 8 |

| | | | |
|---|---|---|---|
| 5.10. | Investment Experience | ............................ | 8 |
| 5.11. | Accredited Investor | ............................. | 8 |
| 5.12. | Restricted Securities | ............................. | 8 |

**SECTION 6.** Other Matters ................................ 8

| | | | |
|---|---|---|---|
| 6.1. | Noncompetition | ............................. | 8 |
| 6.2. | No Interference | ............................. | 9 |
| 6.3. | Nonsolicitation | ............................. | 9 |

**SECTION 7.** Miscellaneous ................................ 10

| | | | |
|---|---|---|---|
| 7.1. | Payment of Expenses | ........................... | 10 |
| 7.2. | Brokers' and Finders' Fees | ........................ | 10 |
| 7.3. | Notices | ............................. | 10 |
| 7.4. | Governing Law | ............................. | 11 |
| 7.5. | No Benefit to Others | ............................. | 11 |
| 7.6. | Contents of Agreement | ........................... | 11 |
| 7.7. | Section Headings and Gender | ....................... | 12 |
| 7.8. | Disclosure Schedule and Exhibits | .................... | 12 |
| 7.9. | Cooperation | ............................. | 12 |
| 7.10. | Severability | ............................. | 12 |
| 7.11. | Counterparts | ............................. | 12 |
| 7.12. | Stock Put and Call Option | ........................ | 12 |
| 7.13. | Jurisdiction | ............................. | 12 |

**EXHIBITS:**

Exhibit A -   Form of Negotiable Convertible Promissory Note
Exhibit B -   Form of Put Agreement
Exhibit C -   Form of Registration Rights Agreement
Exhibit D -   Form of Employment Agreement

3

## SHARE PURCHASE AGREEMENT

### INTRODUCTION

This **SHARE PURCHASE AGREEMENT** (the "Agreement") is made and entered into as of the 1st day of July, 1996. The parties are those persons listed on Exhibit A hereto (individually, each a "Shareholder" and collectively, the "Shareholders"), **RETIREMENT CARE ASSOCIATES, INC.**, a Colorado corporation ("RCA"), and **CONTOUR MEDICAL, INC.**, a Nevada corporation (the "Buyer").

### BACKGROUND

The Shareholders own twenty (20) shares of Common Stock, $5.00 par value per share, of Facility Supply, Inc., 80 shares of Common Stock, $1.00 par value per share of Florida ACLF, Inc. and 20 shares of Common Stock $1.00 par value per share, of GeriMed, Inc. (collectively, the "Shares"), all of which are Florida corporations (collectively, the "Company"), with each Shareholder owning the number and type of Shares set forth after such Shareholder's name in column B of Exhibit A hereto. The Buyer desires to purchase from the Shareholders, and the Shareholders desire to sell to the Buyer, all of the Shares in accordance with the terms and conditions set forth in this Agreement.

**NOW, THEREFORE**, in consideration of the respective covenants, representations and warranties herein contained, and intending to be legally bound hereby, the parties hereto hereby agree as follows:

### TERMS AND CONDITIONS

#### SECTION 1.    Definitions.

For convenience and brevity, certain terms used in various parts of this Agreement are listed in alphabetical order and defined or referred to below (such terms to be equally applicable to both singular and plural forms of the terms defined).

"Acquisition" means the acquisition of all of the Shares by the Buyer and all related transactions provided for in or contemplated by this Agreement.

"Atlantic" means Atlantic Medical Supply Company, Inc., a Georgia corporation, which owns 80% of the issued and outstanding capital stock of the Company.

"Business" means the existing business, operations, facilities and other Assets, finances, products, supplies, customers and customer relations and personnel of the Company.

"Buyer" has the meaning set forth in the Preamble thereto.

"Closing" and "Closing Date" are defined in Section 3.1 hereof.

"Company" has the meaning set forth in the Preamble hereto.

"Contract" means any written or oral contract, agreement, lease, plan, instrument, purchase order or other document, commitment, arrangement, undertaking, practice or authorization that is binding on any Person or its property under applicable Law.

"Court Order" means any judgment, decree, injunction, order or ruling of any federal, state or local court or governmental or regulatory body or authority that is binding on any Person or its property under applicable Law.

"Default" means (i) a breach of or default under any Contract, (ii) the occurrence of an event that with the passage of time or the giving of notice or both would constitute a breach of or default under any Contract, or (iii) the occurrence of an event that with or without the passage of time or the giving of notice or both would give rise to a right of termination, renegotiation or acceleration under any Contract.

"Employment Agreement" means an Employment Agreement executed by the Company and each Shareholder substantially in the form of Exhibit D hereto.

"Exchange Act" has the meaning set forth in Section 5.5 hereof.

"GAAP" means generally accepted accounting principles consistently applied, on a consistent basis, set forth in the Opinions of the Accounting Principles Board of the American Institute of Certified Public Accountants or their successors, which are applicable in the circumstances as of the date in question. The requisite that such principles be applied on a consistent basis shall mean that the accounting principles observed in a current period are comparable in all material respects to those applied in a preceding period.

"Law" means the common law of any applicable jurisdiction and any code, law, order, ordinance, regulation, rule or statute of any Governmental Authority.

"Lien" means any mortgage, lien, security interest, pledge, encumbrance, restriction on transferability, defect of title, charge or Claim of any nature whatsoever on any property or property interest.

"Noncompete Period" is defined in Section 7.1 hereof.

"Note" means a negotiable convertible promissory note executed by the Buyer and acknowledged and agreed to by RCA substantially in the form of Exhibit A hereto.

"Person" means any individual, partnership, firm, corporation, association, trust, unincorporated organization or other entity, as well as any other syndicate or group that would be deemed to be a person under Section 13(d)(3) of the Securities Exchange Act of 1934, as amended.

2

"Put Agreement" means a put agreement executed by RCA and the Shareholders substantially in the form of Exhibit B hereto.

"RCA" has the meaning set forth in the Preamble hereto.

"RCA Common Stock" means the $.0001 par value per share common stock of RCA.

"Registration Rights Agreement" means a registration rights agreement executed by RCA and the Shareholders substantially in the form of Exhibit C hereto.

"Regulation" means any statute, Law, ordinance, regulation, order or rule of any Governmental Authority, including, without limitation, those covering environmental, energy, safety, health, transportation, bribery, recordkeeping, zoning, antidiscrimination, antitrust, wage and hour, and price and wage control matters.

"Report" has the meaning set forth in Section 5.5 hereto.

"SEC" has the meaning set forth in Section 5.5 hereto.

"Securities Act" means the Securities Act of 1933, as amended.

"Shareholder" or "Shareholders" has the meaning set forth in the Preamble hereto.

"Shares" has the meaning set forth in the Preamble hereto.

"Subsidiary" means any Person of which fifty percent (50%) or more of the shares of any class or classes having ordinary voting power for the election of at least a majority of the members of the Board of Directors of such Person are owned, directly or indirectly, by Atlantic, the Buyer or RCA, as the case may be.

SECTION 2.   Sale and Purchase of the Shares.   Subject to the terms and conditions hereinafter set forth and on the basis of and in reliance upon the representations, warranties, obligations and agreements set forth herein, at the Closing (i) each Shareholder shall deliver to the Buyer, free and clear of all Liens, the certificates for the Shares to be sold by such Shareholder in negotiable form, duly endorsed in blank, or with separate notarized stock transfer powers attached thereto and signed in blank, in exchange for the delivery to such Shareholder of (A) a check from the Buyer in the amount of $25,000, (B) a Note in the amount of $175,000, (C) a Put Agreement, and (D) a Registration Rights Agreement, and (ii) the Company and each Shareholder shall execute and deliver an Employment Agreement.

SECTION 3.   Closing.   The Closing (the "Closing") of the Acquisition shall take place simultaneously with the execution hereof, at the offices of Rogers & Hardin in Atlanta, Georgia at 10:00 A.M. local time, on August 9, 1996, or at such other time or place or on such other date as the Buyer and the Shareholders may agree to in writing. The Acquisition shall be

3

effective as of 12:01 A.M., local time, July 1, 1996. The date of the Closing is hereinafter sometimes referred to as the "Closing Date."

## SECTION 4.   Representations and Warranties of the Shareholders.

The Shareholders, jointly and severally, represent and warrant to the Buyer and RCA as follows:

4.1.    Share Ownership.  The Shareholders own, of record and beneficially, the Shares, free and clear of any Liens.

4.2.    Authority and Binding Effect.  Each Shareholder has the full power and authority to execute, deliver and perform this Agreement and has taken all actions necessary to secure all approvals required in connection therewith. The execution and delivery of this Agreement and the consummation of the transactions herein contemplated will not contravene or violate the Articles of Incorporation or By-Laws of the Company. This Agreement constitutes the legal, valid and binding obligation of the Shareholders, enforceable against the Shareholders in accordance with its terms.

4.3.    Validity of Contemplated Transactions.  Neither the execution and delivery of this Agreement by the Shareholders nor the consummation of the transactions contemplated hereby will contravene or violate any Regulation or Court Order which is applicable to the Company or the Shareholders, or will result in a Default under, or require the consent or approval of any party to, any Contract relating to the Business or the Assets or to or by which the Company or such Shareholder is a party or otherwise bound or affected, or require the Company or such Shareholder to notify or obtain any License from any federal, state, local or other court or governmental agency or body or from any other regulatory authority.

4.4.    Restrictions.  Neither of the Shareholders is a party to any Contract or subject to any restriction or any Court Order or Regulation which adversely affects the Company, the Assets or the Business or affects or restricts the ability of the Company or the Shareholders to consummate the Acquisition.

4.5.    Full Disclosure.  There are and will be no materially misleading misstatements in any of the representations and warranties made by the Shareholders in this Agreement or in any of the instruments delivered by the Shareholders pursuant hereto, and the Shareholders have not omitted to state any fact necessary to make such representations and warranties not materially misleading.

4.6.    Purchase Entirely for Own Account.  The Notes issued to the Shareholders hereunder and the RCA Common Stock issuable upon conversion thereof (collectively, the "Securities") will be acquired for investment for the Shareholders' own account, not as a nominee or agent, and not with a view to the resale or distribution of any part thereof; the Shareholders have no present intention of selling, granting any participation in, or otherwise

4

distributing the same; and the Shareholders do not have any contract, undertaking, agreement or arrangement with any Person to sell, transfer or grant participations to such Person with respect to any of the Securities.

**4.7. Reliance Upon Representations.** The Shareholders understand that the Note is not, and any Common Stock acquired on conversion thereof at the time of issuance will not be, registered under the Securities Act in reliance on the exemption from registration provided by Section 4(2) of the Securities Act, and that the Buyer's and RCA's reliance on such exemption is predicated on the Shareholders' representations set forth herein.

**4.8. Receipt of Information.** The Shareholders believe they have received all the information they consider necessary or appropriate for deciding whether to engage in the Transaction. The Shareholders further represent that they have had an opportunity to ask questions of and receive answers from the Buyer and RCA regarding the terms and conditions of the Acquisition and the business, properties, prospects and financial condition of the Buyer and RCA and to obtain additional information (to the extent the Buyer or RCA possessed such information or could acquire it without unreasonable effort or expense) necessary to verify the accuracy of any information furnished to the Shareholders or to which the Shareholders had access. The foregoing, however, does not limit or modify any of the representations and warranties of the Buyer or RCA in this Agreement or the Exhibits hereto or the right of the Shareholders to rely thereon.

**4.9. Investment Experience.** The Shareholders acknowledge that each of them is able to fend for himself or herself, as the case may be, can bear the economic risk of the Note, and has such knowledge and experience in financial and business matters that such Shareholder is capable of evaluating the risks of the Acquisition.

**4.10. Accredited Investor.**

(a) The term "Accredited Investor" as used herein refers to:

(i) Any Shareholder whose individual net worth, or joint net worth with such Shareholder's spouse, at the time of his purchase exceeds $1,000,000; or

(ii) Any Shareholder who had an individual income in excess of $200,000 in each of the two most recent years or joint income with such Shareholder's spouse in excess of $300,000 in each of those years and has a reasonable expectation of reaching the same income level in the current year.

As used in this Section 4.10, the term "net worth" means the excess of total assets over total liabilities. For the purpose of determining a person's net worth, the principal residence owned by an individual should be valued at fair market value, including the cost of improvements, net of current encumbrances. As used in this Section 4.10, "income" means actual economic income, which may differ from adjusted gross income for income tax purposes.

5

Accordingly, such Shareholder should consider whether such Shareholder should add any or all of the following items to such Shareholder's adjusted gross income for income tax purposes in order to reflect more accurately such Shareholder's actual economic income: any amounts attributable to tax-exempt income received, losses claimed as a limited partner in any limited partnership, deductions claimed for depletion, contributions to an IRA or Keogh retirement plan, and alimony payments.

      (b)      Each Shareholder is an Accredited Investor.

**4.11. Restricted Securities.** The Shareholders understand that the Notes (and any RCA Common Stock issued on conversion thereof) may not be sold, transferred, or otherwise disposed of without registration under the Securities Act or an exemption therefrom, and that in the absence of an effective registration statement covering the Notes (or any RCA Common Stock issued on conversion thereof) or an available exemption from registration under the Securities Act, the Notes (and any RCA Common Stock issued on conversion thereof) must be held indefinitely. In particular, the Shareholders are aware that the Notes (and any RCA Common Stock issued on conversion thereof) may not be sold pursuant to Rule 144 promulgated under the Securities Act unless all of the conditions of that Rule are met.

**4.12. Legends.** To the extent applicable, the Notes and each certificate or other document evidencing any RCA Common Stock issued upon conversion thereof shall be endorsed with a legend substantially as set forth below:

> "THE SECURITIES REPRESENTED HEREBY HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, AND MAY NOT BE SOLD, TRANSFERRED, ASSIGNED PLEDGED, OR HYPOTHECATED UNLESS AND UNTIL REGISTERED UNDER SUCH ACT, OR UNLESS THE ISSUER HAS RECEIVED AN OPINION OF COUNSEL OR OTHER EVIDENCE, SATISFACTORY TO THE COMPANY AND ITS COUNSEL, THAT SUCH REGISTRATION IS NOT REQUIRED."

## SECTION 5. Representations and Warranties of the Buyer and RCA.

The Buyer as to itself only, and RCA as to itself only, hereby represents and warrants to the Shareholders as follows:

**5.1. Organization and Standing.** Each of the Buyer and RCA is a corporation duly organized, validly existing and in good standing under the Laws of its jurisdiction of incorporation, having all requisite corporate power and authority to perform its obligations under this Agreement.

**5.2. Authority and Binding Effect.** Each of the Buyer and RCA has the corporate power and authority to execute, deliver and perform this Agreement, the Notes and, in the case

6

of RCA, the Put Agreement, and has taken all actions necessary to secure all approvals required in connection therewith. The execution, delivery and performance of the Put Agreement by RCA and this Agreement and the Notes by the Buyer and RCA and have been duly authorized by all necessary corporate action. Each of this Agreement and the Notes constitutes the legal, valid and binding obligation of the Buyer and RCA, enforceable against them in accordance with its terms; and the Put Agreement constitutes the legal, valid and binding obligation of RCA, enforceable against it in accordance with its terms.

5.3. **Validity of Contemplated Transactions.** Neither the execution and delivery of this Agreement or the Notes by the Buyer nor the consummation of the transactions contemplated hereby by the Buyer will contravene or violate any Regulation or Court Order which is applicable to the Buyer, or the Articles of Incorporation or By-Laws of the Buyer, or will result in a Default under any Contract to which the Buyer is a party or by which it is otherwise bound or affected, or require the Buyer to notify or obtain any License from any federal, state, local or other court or governmental agency or body or from any other regulatory authority.

5.4. **Restrictions.** Neither the Buyer nor RCA is a party to any Contract or subject to any restriction or any Court Order or Regulation which adversely affects the Company, any Subsidiary, the Assets or the Business or affects or restricts the ability of the Buyer or RCA to consummate the Acquisition.

5.5. **Reports.** (i) RCA's Annual Report on Form 10-K for the fiscal year ended June 30, 1995, as filed with the Securities and Exchange Commission ("SEC"), (ii) RCA's proxy statement for its 1995 annual meeting of shareholders, and (iii) all other reports and registration statements filed by RCA with the SEC since the end of the fiscal year ended June 30, 1995 were each prepared in compliance with the applicable requirements of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), and the rules and regulations thereunder. As of its date, no Report contained any untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein, in light of the circumstances under which they were made, not misleading. The audited consolidated financial statements and unaudited interim financial statements included in the Reports have been prepared in accordance with GAAP applied on a consistent basis (except as may be indicated therein or in the notes thereto) and fairly present the consolidated financial position of RCA and its Subsidiaries as of the dates thereof and the consolidated results of operations and changes in cash flow of RCA and its Subsidiaries for each of the periods then ended, subject, in the case of unaudited interim financial statements, to normal year-end adjustments. Since the end of the quarter ended March 31, 1996, there has been no material adverse change in the assets, liabilities, results of operations, financial condition, business or prospects of RCA and its Subsidiaries taken as a whole.

5.6. **Full Disclosure.** There are and will be no materially misleading misstatements in any of the representations and warranties made by the Buyer or RCA in this Agreement or in any of the instruments delivered by the Buyer or RCA pursuant hereto, and neither the Buyer

7

nor RCA has omitted to state any fact necessary to make such representations and warranties not materially misleading.

5.7. **Purchase Entirely for Own Account.** The Shares will be acquired for investment for the Buyer's own account, not as a nominee or agent, and not with a view to the resale or distribution of any part thereof; the Buyer has no present intention of selling, granting any participation in, or otherwise distributing the same; and the Buyer does not have any contract, undertaking, agreement or arrangement with any Person to sell, transfer or grant participations to such Person with respect to any of the Shares.

5.8. **Reliance Upon Representations.** The Buyer understands that the Shares are not registered under the Securities Act in reliance on the exemption from registration provided by Section 4(2) of the Securities Act, and that the Shareholder's reliance on such exemption is predicated on the Buyer's representations set forth herein.

5.9. **Receipt of Information.** The Buyer believes it has received all the information the Buyer considers necessary or appropriate for deciding whether to engage in the Transaction. The Buyer further represents that it has had an opportunity to ask questions of and receive answers from the Shareholders regarding the terms and conditions of the Acquisition and the business, properties, prospects and financial condition of the Company and to obtain additional information (to the extent the Shareholders possessed such information or could acquire it without unreasonable effort or expense) necessary to verify the accuracy of any information furnished to the Buyer or to which the Buyer had access. The foregoing, however, does not limit or modify any of the representations and warranties of the Shareholders in this Agreement or the Exhibits hereto or the right of the Buyer to rely thereon.

5.10. **Investment Experience.** The Buyer represents that it is experienced in evaluating and investing in transactions similar to the Acquisition and has such knowledge and experience in financial and business matters that it is capable of evaluating the merits and risks of the Acquisition.

5.11. **Accredited Investor.** The Buyer is an "accredited investor" within the meaning of Rule 501(a) of Regulation D as promulgated under the Securities Act.

5.12. **Restricted Securities.** The Buyer understands that the Shares may not be sold, transferred, or otherwise disposed of without registration under the Securities Act or an exemption therefrom and that in the absence of an effective registration statement covering the Shares or an available exemption from registration under the Securities Act the Shares must be held indefinitely.

### SECTION 6. Other Matters.

6.1. **Noncompetition.** Each Shareholder agrees, individually and not on behalf of any other Shareholder, that, from the Closing Date until the end of three (3) years following the

8

Closing Date or two (2) years following the termination of such Shareholder's employment by the Company for any reason whatsoever, whichever is later (the "Noncompete Period"), such Shareholder, unless acting in accordance with the Buyer's prior written consent and except as an employee of, or consultant to or director of, the Company or the Buyer will not (directly or indirectly)), own, manage, operate, join, control, finance or participate in the ownership, management, operation, control or financing of, or be connected as an officer, director, employee, principal, agent, representative, consultant, investor, owner, partner, manager, joint venturer or otherwise with, or permit his or her name to be used by or in connection with, or lease, sell or permit to use any real property or interest therein owned by such Shareholder to, any Person engaged anywhere in the counties of Palm Beach, Broward or Dade in the State of Florida (and in any other Florida county in which such Shareholder, on behalf of the Company, hereafter engages) in the promotion, sale or distribution of medical supplies and services to (i) the hospital, nursing home and other long term care markets, (ii) doctors, home health agencies and other providers and (iii) distributors and other sellers and resellers of medical supplies, including those reimbursed under the Medicare Part A and Medicare Part B programs or in the business of providing sales and billing services under those programs; provided, however, that the provisions of this Section 6.1 shall not be deemed to (i) prohibit the ownership by any Shareholder of not more than five percent (5%) of any corporation having a class of securities registered pursuant to the Exchange Act. Each Shareholder acknowledges that (i) the provisions of this Section 6.1 are reasonable and necessary to protect the legitimate interest of the Buyer hereunder, (ii) any violation of this Section 6.1 will result in irreparable injury to the Buyer and the Company and that damages at law would not be reasonable or adequate compensation to the Buyer and the Company and for a violation of this Section 6.1, and (iii) Buyer and the Company shall be entitled to have the provisions of this Section 6.1 specifically enforced by preliminary and permanent injunctive relief without the necessity of proving actual damages and without posting bond or other security as well as to an equitable accounting of all earnings, profits and other benefits arising out of any violation of this Section 6.1. In the event that the provisions of this Section 6.1 should ever be deemed to exceed the time, geographic, product or any other limitations permitted by applicable law, then such provisions shall be deemed reformed to the maximum permitted by applicable law.

**6.2. No Interference.** Each Shareholder agrees individually and not on behalf of any other Shareholder, that, during the Noncompete Period, such Shareholder will not (directly or indirectly) hire or offer employment to any employee of the Company or the Buyer or any of its Subsidiaries whose employment is continued by the Company, the Buyer or such Subsidiary or the Buyer after the Closing Date unless the Company, the Buyer or such Subsidiary, as the case may be, first terminates the employment of such employee.

**6.3. Nonsolicitation.** Each Shareholder agrees, individually and not on behalf of any other Shareholder, that, during the Noncompete Period, such Shareholder will not (directly or indirectly) call on or solicit for the purpose of providing any goods or services competitive with those offered by the Company or the Buyer or any of its Subsidiaries to, or direct or take away from the Company, the Buyer or any such Subsidiary the business of (including, without limitation, by divulging to any competitor of the Company, the Buyer or any such Subsidiary

9

the name of), any Person who or which at the Closing Date was, or at any time during the Noncompete Period is, a customer of the Company, the Buyer or any such Subsidiary and who has been or is solicited by such Shareholder on behalf of the Company.

## SECTION 7. Miscellaneous.

7.1.   **Payment of Expenses.**  Each of the Shareholders and the Buyer shall pay all legal, accounting and other fees and expenses which such party incurs in connection with this Agreement and the transactions contemplated hereby, and none of the expenses of the Shareholders shall be paid by the Company or out of any of the Assets.

7.2.   **Brokers' and Finders' Fees.**  The Shareholders as a group and the Buyer each to the other represents and warrants that all negotiations relative to this Agreement have been carried on by them directly without the intervention of any Person who or which may be entitled to any brokerage fee or other commission in respect of the execution of this Agreement or the consummation of the transactions contemplated hereby, and each of them shall indemnify and hold the other or any Affiliate of them harmless against any and all Claims, losses, liabilities or expenses which may be asserted against any of them as a result of any dealings, arrangements or agreements by the indemnifying party with any such Person.

7.3.   **Notices.**  Any notice, request, demand, waiver, consent, approval or other communication which is required or permitted hereunder shall be in writing and shall be deemed given only if delivered personally to the address set forth below (to the attention of the Person identified below) or sent by telegram or by registered or certified mail, postage prepaid, as follows:

If to the Buyer or the Company, to:

Contour Medical Company
3340 Scherer Drive
St. Petersburg, Florida  33716

Attention:  President

With required copies to:

Steven E. Fox
Rogers & Hardin
2700 International Tower, Peachtree Center
229 Peachtree Street, N.E.
Atlanta, Georgia  30303

10

If to RCA, to:

Retirement Care Associates, Inc.
6000 Lake Forrest Drive
Suite 200
Atlanta, Georgia 30328

Attention: President

With required copies to:

Philip M. Rees, Esq.
6000 Lake Forrest Drive
Suite 200
Atlanta, Georgia 30328

If to the Shareholders, to their addresses set forth on Exhibit B hereto, with required copies to:

Mike Segal, Esq.
Broad and Cassel
Suite 3000
Miami Center
201 South Biscayne Boulevard
Miami, Florida 33131

or to such other address as the addressee may have specified in a notice duly given to the sender and to counsel as provided herein. Such notice, request, demand, waiver, consent, approval or other communication will be deemed to have given as of the date so delivered or telegraphed or, if mailed, three business days after the date so mailed.

7.4. Governing Law. This Agreement shall be governed by and interpreted and enforced in accordance with the Laws of Georgia without reference to the conflict of laws principles thereof.

7.5. No Benefit to Others. The representations, warranties, covenants and agreements contained in this Agreement are for the sole benefit of the parties hereto and their respective heirs, executors, legal representatives, successors and assigns and shall not be construed as conferring, and are not intended to confer, any rights on any other Persons.

7.6. Contents of Agreement. This Agreement, together with any documents referred to herein, sets forth the entire agreement of the parties hereto with respect to the transactions contemplated hereby. This Agreement may not be amended except by an instrument in writing signed by the parties hereto, and no claimed amendment, modification, termination or waiver

11

shall be binding unless in writing and signed by the party against whom or which such claimed amendment, modification, termination or waiver is sought to be enforced.

7.7. **Section Headings and Gender**. All section headings and the use of a particular gender are for convenience only and shall in no way modify or restrict any of the terms or provisions hereof. Any reference in this Agreement to a Section or Exhibit shall be deemed to be a reference to a Section or Exhibit of this Agreement unless the context otherwise expressly requires.

7.8. **Disclosure Schedule and Exhibits**. All Exhibits hereto and the Disclosure Schedule referred to herein are intended to be and hereby are specifically made a part of this Agreement. An item disclosed in the Disclosure Schedule in response to one Section of this Agreement shall not be deemed disclosed in response to any other Section unless otherwise specifically so provided.

7.9. **Cooperation**. Subject to the provisions hereof, the parties hereto shall use their best efforts to take, or cause to be taken, such action, to execute and deliver, or cause to be executed and delivered, such additional documents and instruments and to do, or cause to be done, all things necessary, proper or advisable under the provisions of this Agreement and under applicable Law to consummate and make effective the transactions contemplated by this Agreement.

7.10. **Severability**. Any provision of this Agreement which is invalid or unenforceable in any jurisdiction shall be ineffective to the extent of such invalidity or unenforceability without invalidating or rendering unenforceable the remaining provisions hereof, and any such invalidity or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

7.11. **Counterparts**. This Agreement may be executed in two or more counterparts, each of which is an original and all of which together shall be deemed to be one and the same instrument. This Agreement shall become binding when one or more counterparts taken together shall have been executed and delivered by all of the Parties. It shall not be necessary in making proof of this Agreement or any counterpart hereof to produce or account for any of the other counterparts.

7.12. **Stock Put and Call Option**. By execution hereof, the Shareholders agree that the Stock Put and Call Option dated as of December 4, 1995, between the Shareholders and Atlantic is hereby terminated in its entirety and that they shall no longer have any rights thereunder.

7.13. **Jurisdiction**. Any action, suit or proceeding seeking to enforce any provision of, or based on any matter arising out of or in connection with, this Agreement or the transactions contemplated hereby may be brought against any of the parties in the United States District Court for any District of Georgia, or any state court sitting in the City of Atlanta, Georgia, and each of the parties hereby consents to the exclusive jurisdiction of such courts (and of the

12

appropriate appellate courts) in any such suit, action or proceeding and waives any objection to venue laid therein. Process in any such suit, action or proceeding may be served on any party anywhere in the world, whether within or without the State of Georgia, without limiting the foregoing, each of the parties hereto agrees that service of process upon such party at the address referred to in Section 7.13, together with written notice of such service to such party, shall be deemed effective service of process upon such party.

IN WITNESS WHEREOF, each of the Shareholders has duly executed and sealed this Agreement, and each of the Buyer and RCA has caused this Agreement to be duly executed under seal on its behalf by an officer thereunto duly authorized, all on the date first written above.

SHAREHOLDERS:

_____ (SEAL)
GARY COHEN

_____ (SEAL)
ROSEANN COHEN

**[SIGNATURES CONTINUED ON PAGE 14]**

13

CONTOUR MEDICAL, INC.

[CORPORATE SEAL]

Attest: _____

By: _____
  Its: _____

RETIREMENT CARE ASSOCIATES, INC.

[CORPORATE SEAL]

Attest: _____

By: _____
  Its: _____

14

**[SIGNATURES CONTINUED FROM PAGE 13]**

CONTOUR MEDICAL, INC.

[CORPORATE SEAL]

By: _____
In: ___PRESIDENT___

Attest: _____

RETIREMENT CARE ASSOCIATES, INC.

[CORPORATE SEAL]

By: _____
Its: _____

Attest: _____

14

JS 44
(Rev ...)

**00-6643**

**CIVIL COVER SHEET**

**MAGISTRATE JUDGE GARBER**

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

**I. (a) PLAINTIFFS**

SUNCHOICE MEDICAL SUPPLY, INC.

**DEFENDANTS**

GARY COHEN, ROSEANN COHEN, AND STAR MEDICAL DISTRIBUTERS, LLC

**(b)** COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF _NEW MEXICO CNTY_
(EXCEPT IN U.S. PLAINTIFF CASES)

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT _BROWARD_
(IN U.S. PLAINTIFF CASES ONLY)

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED

**(c)** ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)

MICHAEL M. HERNANDEZ, ESQ.
STEARNS LEWIS SCHNITZER AND KAUFMAN, SUITE 2600
200 S. BISCAYNE BLVD. MIAMI, FL 33131 (305) 577-7600

ATTORNEYS (IF KNOWN)

**(d)** CIRCLE COUNTY WHERE ACTION AROSE: DADE, MONROE, **BROWARD**, PALM BEACH, MARTIN, ST. LUCIE, INDIAN RIVER, OKEECHOBEE, HIGHLANDS

**II. BASIS OF JURISDICTION** (PLACE AN "X" IN ONE BOX ONLY)

- ☐ 1 U.S. Government Plaintiff
- ☐ 2 Federal Question (U.S. Government Not a Party)
- ☐ 3 U.S. Government Defendant
- ☒ 4 Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** (PLACE AN "X" IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT) (For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☒ | Incorporated or Principal Place of Business in This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☒ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☒ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 5 | ☐ 6 |

**IV. ORIGIN** (PLACE AN "X" IN ONE BOX ONLY)

- ☒ 1 Original Proceeding
- ☐ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Reinstated or Reopened
- ☐ 5 Transferred from another district (specify)
- ☐ 6 Multidistrict Litigation
- ☐ 7 Appeal to District Judge from Magistrate Judgment

**V. NATURE OF SUIT** (PLACE AN "X" IN ONE BOX ONLY)

| A CONTRACT | A TORTS | FORFEITURE/PENALTY | A BANKRUPTCY | A OTHER STATUTES |
|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** / **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane / ☐ 362 Personal Injury — Med. Malpractice | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881 | | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander / ☐ 365 Personal Injury — Product Liability | ☐ 630 Liquor Laws | **A PROPERTY RIGHTS** | ☐ 450 Commerce/ICC Rates/etc |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability / ☐ 368 Asbestos Personal Injury Product Liability | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine | ☐ 650 Airline Regs | ☐ 830 Patent | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability | ☐ 660 Occupational Safety/Health | ☐ 840 Trademark | ☐ 810 Selective Service |
| | **PERSONAL PROPERTY** | ☐ 690 Other | | ☐ 850 Securities/Commodities/Exchange |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle / ☐ 370 Other Fraud | | **A LABOR** / **B SOCIAL SECURITY** | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability / ☐ 371 Truth in Lending | | ☐ 710 Fair Labor Standards Act / ☐ 861 HIA (1395ff) | ☐ 891 Agricultural Acts |
| ☒ 190 Other Contract | ☐ 360 Other Personal Injury / ☐ 380 Other Personal Property Damage | | ☐ 720 Labor/Mgmt Relations / ☐ 862 Black Lung (923) | ☐ 892 Economic Stabilization Act |
| ☐ 195 Contract Product Liability | / ☐ 385 Property Damage Product Liability | | | ☐ 863 DIWC/DIWW (405(g)) |
| | | | | ☐ 864 SSID Title XVI |
| **A REAL PROPERTY** | **A CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 730 Labor/Mgmt Reporting & Disclosure Act / ☐ 865 RSI (405(g)) | ☐ 893 Environmental Matters |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate Sentence | ☐ 740 Railway Labor Act | ☐ 894 Energy Allocation Act |
| ☐ 220 Foreclosure | ☐ 442 Employment | **HABEAS CORPUS:** | | ☐ 895 Freedom of Information Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/Accommodations | ☐ 530 General / **FEDERAL TAX SUITS** | ☐ 790 Other Labor Litigation | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 240 Torts to Land | ☐ 444 Welfare | ☐ 535 Death Penalty | ☐ 791 Empl. Ret. Inc. Security Act / ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 950 Constitutionality of State Statutes |
| ☐ 245 Tort Product Liability | ☐ 440 Other Civil Rights | ☐ 540 Mandamus & Other | / ☐ 871 IRS — Third Party 26 USC 7609 | ☐ 890 Other Statutory Actions |
| ☐ 290 All Other Real Property | | ☐ 550 Civil Rights | | A OR B |
| | | ☐ 555 Prison Condition | | |

**VI. CAUSE OF ACTION** (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE BRIEF STATEMENT OF CAUSE DO NOT CITE JURISDICTIONAL STATUTES UNLESS DIVERSITY)

DIVERSITY JURISDICTION 28 U.S.C. 1332
BREACH OF RESTRICTIVE COVENANTS AND RELATED TORTS

LENGTH OF TRIAL via ___ days estimated (for both sides to try entire case)

**VII. REQUESTED IN COMPLAINT:**
- ☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

**DEMAND $** IN EXCESS OF $75,000

CHECK YES only if demanded in complaint: **JURY DEMAND:** ☐ YES ☒ NO

**VIII. RELATED CASE(S) IF ANY** (See instructions)

JUDGE ___ DOCKET NUMBER ___

DATE MAY 11, 2000

SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT # _519338_ AMOUNT _150.00_ APPLYING IFP ___ JUDGE ___ MAG. JUDGE ___